Matthew G. Pfau, Esq.
California Bar No.: 256309
PARRY & PFAU
880 Seven Hills Drive, Suite 210
Henderson, Nevada 89052
702 879 9555 TEL
702 879 9556 FAX
matt@p2lawyers.com

Attorneys for Plaintiff,
*Denise Harrison*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

* * *

| | |
|---|---|
| **Denise Harrison**, an individual<br><br>Plaintiff,<br>vs.<br><br>**Bayer Corp.**, an Indiana corporation; **Bayer Healthcare, LLC**, a Delaware corporation; **Bayer Essure, Inc., (F/K/A Conceptus)**, a Delaware corporation; **Bayer Healthcare Pharmaceuticals, Inc.**, a Delaware corporation, Does 1 through 10, inclusive and Roe Business Entities 1 through 10, inclusive<br><br>Defendants. | Case No. 8:16-CV-01958-MWF-MRW<br><br>**First Amended Complaint**<br><br>Judge: Hon. Michael W. Fitzgerald |

Plaintiff, Denise Harrison ("Ms. Harrison"), being represented by her attorney of record, Matthew G. Pfau, Esq. of PARRY & PFAU, hereby complains against Defendants Bayer, Corp., Bayer Healthcare, LLC, Bayer AG, Bayer Healthcare Pharmaceuticals, Inc., and Bayer Essure, Inc., Roe Business Entities I through 10 and Does 1 through 10 inclusive, (hereinafter collectively referred to as "Defendants" or Bayer") for personal injuries suffered as a result of Plaintiff Denise Harrison being prescribed and using the defective and unreasonably dangerous product Essure®. At all relevant times hereto, Essure® was manufactured, designed, formulated, tested, labeled, produced, created,

1  made constructed assembled, marketed, advertised, distributed and sold by Defendants

2  or by Conceptus, Inc. which merged with Bayer on or about April 28, 2013.

3

4  ### I. Introduction

5  1. The primary responsibility for timely communicating complete, accurate and

6  current safety and efficacy information related to a medical device rests with the

7  manufacturer; the manufacturer has superior, and in many cases exclusive, access to the

8  relevant safety and efficacy information, including post-market complaints and data.

9  2. To fulfill this essential responsibility, a manufacturer must vigilantly monitor all

10  reasonably available information. The manufacturer must closely evaluate the post-

11  market clinical experience with the device and its components and timely provide updated

12  safety and efficacy information to the healthcare community and to consumers. The

13  manufacturer also must carefully monitor its own manufacturing operations and quality

14  controls to ensure that the device uniformly conforms to the manufacturer's approved

15  design, as well as its representations and warranties and with specifications of approval.

16  3. When monitoring and reporting adverse events, as required by both federal

17  regulations and California law, time is of the essence. The purpose of monitoring a

18  product's post-market experience is to detect potential safety signals that could indicate

19  to the manufacturer and the medical community that a public safety problem exists. If a

20  manufacturer waits to report post-market information, even for a few weeks or months,

21  that bottleneck could mean that researchers, regulatory bodies, and the medical

22  community are years behind in identifying a public safety issue associated with the

23  device. In the meantime, more patients are harmed by using the product without

24  understanding its true risks. This is why a manufacturer must not only completely and

25  accurately monitor, investigate and report post-market experiences, but it must also

26  report the data as soon as it is received.

27  4. This action arises from Defendants' post-market failures and misrepresentations

28  about the safety and efficacy of their permanent birth control device, Essure®, and their

_____

PARRY⊗PFAU

1  failures to timely communicate accurate, complete, and current information about the
2  risks of the device as learned from post-market experiences. The conduct of Defendants,
3  as set forth below, violated its obligations under relevant federal and state regulations
4  governing the post-market conduct of Class III medical device manufacturers. The same
5  conduct also violated Defendants' duties under California law, thereby causing injury to
6  Ms. Harrison for which she seeks damages.

7  ## II. Parties and Jurisdiction

8      5.  This Court has subject matter jurisdiction based upon diversity of citizenship, see
9  28 U.S.C. § 1441, because this is a civil action between citizens of different states, and
10  the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.[1]

11  ### A. Complete Diversity of Citizenship

12      6.  Denise Harrison is a resident of Orange County, State of California, and at all
13  relevant times herein was a resident of the same when the incident occurred.

14      7.  Defendant Bayer Corp, is a for-profit corporation in the state of Indiana and is
15  wholly-owned subsidiary of Bayer A.G doing business throughout the state of California.

16      8.  Defendant Bayer HealthCare LLC, is a for-profit corporation incorporated in the
17  state of Delaware and is wholly-owned subsidiary of Bayer A.G doing business throughout
18  the state of California.

19      9.  Defendant Bayer Essure Inc. (F/K/A Conceptus, Inc.) is a for-profit corporation
20  incorporated in the state of Delaware, and is wholly-owned subsidiary of Bayer A.G and/or
21  Bayer HealthCare LLC. Conceptus, Inc. ("Conceptus") was founded by Julian Nikolchev,
22  a self-described "medical technology developer and serial entrepreneur," in 1992. On or
23  about April 28, 2013, Conceptus Inc. entered into an Agreement and Plan of Merger (the
24  Merger Agreement") with Bayer HealthCare LLC. On or about June 5, 2013, pursuant to
25  Merger Agreement, Conceptus, Inc. became a wholly-owned subsidiary of Bayer
26  HealthCare LLC and/or Bayer A.G., and thereafter renamed "Bayer Essure Inc." For
27  purposes of this Complaint, Conceptus, Inc. and Bayer Essure Inc. are one and the same.

28

_____

[1] See 28 U.S.C. § 1332.

_____

FIRST AMENDED COMPLAINT

Bayer Essure Inc.'s headquarters are located at 331 East Evelyn Avenue, Mountain View, California 94041. In July of 2013, Bayer Essure Inc. moved its headquarters to 1011 McCarthy Boulevard, Milipitas, Santa Clara County, California 95035. Defendant Bayer Essure Inc. is authorized to and does business throughout the state of California.

10. Defendant Bayer HeathCare Pharmaceuticals, Inc. is for-profit corporation incorporated in the state of Delaware and is wholly-owned subsidiary of Bayer A.G. Defendant is authorized to and does business throughout the state of California.

11. That the names and capacities, whether individual, corporate, associates, co-partnership, or otherwise of Defendants, Jane Doe and Does I through 10, are unknown to Ms. Harrison who therefore sues said Defendants by such fictitious names; once the true names are discovered, Ms. Harrison will ask leave to amend this Complaint to substitute the true names of said Defendants. Ms. Harrison is informed and believes and therefore alleges that the Defendants so designated herein are responsible in some manner for their agency, master/servant or joint venture relationship with Defendants, or otherwise contributed to, as a proximate cause, the damages to Ms. Harrison as herein alleged.

### B. Satisfaction of the Amount-In-Controversy

12. As conceded in the Defendant's Notice of Removal filed on December 27, 2016 with this court, the nature of Plaintiff's alleged injuries, the scope of damages sought, and the lack of any express limitation on the amount of damages sought, the claims alleged herein plainly satisfy the jurisdictional requirement of $75,000 in damages.[2]

### III. Description of Essure® and How it Works

13. Essure® is a medial device manufactured, formulated, tested, packaged, labeled, produced, created, made, constructed, assembled, marketing advertised, promoted, distributed and sold by Defendants.

14. Essure® was first manufactured, formulated, tested, packaged, labeled, produced, created, made, constructed, assembled, marketed, advertised, promoted,

---

[2] See Defendant's Notice of Removal, ¶¶ 23-29.

PARRY⊗PFAU

distributed, and sold by Conceptus, Inc. and initially developed under the name Selective Tubal Occlusion Procedure or "S/TOP™" Permanent Contraception device.

15. Essure® is touted as a permanent form of female birth control (female sterilization). Essure® is a medical device with the intended use of permanent sterilization by causing bilateral occlusions (blockage) of the fallopian tubes by the insertion of micro-inserts into the fallopian tubes which are then supposed to anchor and elicit tissue growth, theoretically causing the blockage. Defendants intended the device to be implanted "permanently", i.e., for the duration of each patient's lifetime.

16. Essure® is a transcervical sterilization, and is touted as a less invasive hysteroscopic procedure that that be performed with minimal anesthesia in a doctor's office.

17. Essure® consists of (1) micro-inserts, (2) disposable delivery system; and (3) a disposable split introducer. All components are intended for a single use.

18. The micro-inserts are comprised of two metal coils which are placed in a woman's fallopian tubes via Defendants' disposable delivery system and under hysteroscopic guidance (camera).

19. The Essure® micro-insert coils are composed of super-elastic nickel-titanium (Nitinol) outer coil, chromium, tin and a stainless steel inner coil wrapped in polyethylene terephthalate fibers (PET) which induce a benign fibrotic response that elicits the invasion of macrophages, fibroblasts, foreign body giant cells, and plasma cells.

20. The hysteroscopic equipment (delivery system) needed to place Essure® was manufactured by a third party, is not part of Defendants' CPMA, and is not a part of Essure®. However, because Ms. Harrison's implanting physician did not have such equipment, Defendants provided it so that they could sell Essure®.

21. The Essure® insert is delivered into each fallopian tube via a disposable delivery system consists of a single handle which contains a delivery wire, release catheter, and delivery catheter. The micro-inserts are attached to the delivery wire. The delivery handle controls the device, delivery and release mechanism. During the placement procedure,

the physician inserts the delivery catheter through a hysteroscope part with the aid of an introducer and guides the catheter to the fallopian tube under observation.

22. Physicians monitor this complicated process visually through the hysteroscopic equipment including a hysteroscope, a lightbox, and a monitor, collectively known as a "tower".

23. Upon information and belief, the towers are valued at approximately $20,000 and were provided by Defendants to physicians for free if the physician purchased a certain number of Essure® units. Defendants provided the disposable delivery system and specialized hysteroscopic equipment manufactured by a third party. The hysteroscopic equipment is a Class II medical that is not subject to pre-market approval; instead it was cleared for use through the 510(k) regulatory pathway.

24. Once the distal tip of the delivery catheter is in place, the physician uses the thumbwheel and button on the delivery handle to retract the delivery wire and deploy the insert. The physician must use tow pre-loaded catheters to achieve bilateral placement.

25. After placement of the coils in the fallopian tubes by Defendants' disposable delivery system, the micro-inserts expand upon release and anchor into the fallopian tubes. The PET fibers in the coil allegedly elicit tissue growth blocking off the fallopian tubes and preventing pregnancy. According to the Defendants, "the tissue in-growth into the insert caused by the PET fibers results in both insert retention and pregnancy prevention."

26. Defendants further claim that the coils are alleged to remain securely in place in the fallopian tubes for the life of the consumer and do not migrate.

27. Defendants claim on their website and advertising materials that "correct placement" of Essure® "is performed easily because of the design of the microinsert," and the physician training manuals lead one to believe the system and hysteroscope allows for visual confirmation of each insert's proper placement during the implant procedure.

_____
FIRST AMENDED COMPLAINT

28. The Instructions For Use ("IFU") accompanying the Essure® device provide that patients should be counseled to receive a confirmation test three months post-implant to determine that the coil micro-inserts have created a complete occlusion in each fallopian tube. The Confirmation Test used is known as a hystersalpinogram ("HSG Test" or "Confirmation Test") and is part of the design and formulation of the Essure® product.

29. Defendants have stated in a publicly available Form 10-K filed with the U.S. Securities and Exchange Commission that the HSG is "often painful" and "is also known to be highly inaccurate, with false-positive results in as many as 40% of HSG-diagnosed cases of proximal tubal occlusion ("PTO"). Various factors are believed to be responsible for these false indications of tubal occlusion, including tubal spasm (a natural function of these tubes) and a build-up in the tube of natural cellular debris and mucous." Defendants does not share this information with patients and physicians.

30. Essure® was designed, manufactured, and marketed to be used by gynecologists throughout the world, as a "quick and easy", "surgery-free" outpatient "simple" procedure and without general anesthesia.

31. Defendants claimed that Essure® "will allow many tubal therapies for permanent contraception which are currently performed surgically to be performed transcervically, thereby reducing the cost, trauma and recovery time associated with those therapies."

**IV. Evolution of Essure®**

32. On April 22, 2002, Conceptus submitted the original Pre-Market Approval (PMA) application (P020014) to the United States Food and Drug Administration ("FDA") for the product.

33. Pre-market Approval ("PMA") is the FDA process of scientific and regulatory review to evaluate the safety and effectiveness of Class II medical devices.  By way of background, Premarket Approval ("PMA") is the FDA process of scientific and regulatory review to evaluate the safety and effectiveness of Class III medical devices. See 21 U.S.C. § 515(b); 21 CFR § 814.3(e).

34. The FDA approved a (conditional) Premarket Approval Application (PMA) for the

– 7 –

_____

Essure® System for Permanent Birth Control on November 4, 2002.

35. Defendants acquired Conceptus on June 5, 2013. For the purpose of this lawsuit, Conceptus and Defendants are one and the same.

36. Essure®, a Class III medical device, is now manufactured, sold, distributed, marketed, and promoted by Defendants.

37. According to the FDA, Class III devices are those that support or sustain human life, are of substantial importance in preventing impairment of human health, or which present a potential, unreasonable risk of illness or injury.

38. A PMA application must contain certain information which is critical to the FDA's evaluation of the safety and efficacy of the medical device at issue. A PMA application must provide:

    A.   Proposed indications for use;

    B.  Device description including the manufacturing process;

    C.  Any marketing history;

    D.  Summary of studies (including non-clinical laboratory studies, clinical investigations involving human subjects, and conclusions from the study that address benefit and risk considerations);

    E.  Each of the functional components or ingredients of the device;

    F.  Methods used in manufacturing the device, including compliance with current good manufacturing practices; and

    G.  Any other information relevant to an evaluation of the safety and effectiveness of the device known or that should reasonably be known to the manufacturer from any source, including commercial marketing experience.

39. Regarding the Premarket Approval Process, devices can either be "approved", "conditionally approved", or "not approved".

40. On November 4, 2002, the Conceptus' Essure® PMA application was "**conditionally approved**" by the FDA.

41. According to the FDA, a class III device that fails to meet the Conditional

Premarket Approval ("CPMA") requirements after marketing is considered to be adulterated under § 501(f) of the Federal Food, Drug and Cosmetic Act ("FDCA") and cannot continue to be marketed.

42. In the CPMA (Conditional Pre-Market Approval) Order issued by the FDA, the FDA expressly stated, "Failure to comply with the conditions of approval invalidated this approval order." The following were the conditions of approval:

   a. Document the "(e)ffectiveness of Essure® is established by annually reporting on the 745 women who took part in clinical tests."

   b. Ensure the "(s)uccessful bilateral placement of Essure® is documented for newly trained physicians."

   c. Report **within 10 days** after Defendants receive or have knowledge or information of any adverse reaction, side effect, injury, toxicity or sensitivity reaction that has not been addressed by the device's labeling and report **within 10 days** after Defendants receive or have knowledge or information of any adverse reaction, side effect, injury, toxicity or sensitivity reaction that has not been addressed by the device's labeling but is occurring with unexpected severity or frequency.

   d. Submit a report to the FDA **within 10 days** after Defendants receive or have knowledge or information of any failure of the device to meet specifications established in the approved PMA that are not correctable by adjustments or procedures described in the approved labeling;

   e. Include in the Annual Report any failures of the device to meet the specifications established in the approved PMA that were correctable by procedures described in the approved labeling;

   f. "Report to the FDA whenever it received information from any source that reasonably suggested that the device may have caused or contributed to a serious injury,"

   g. Warranties are truthful, accurate and not misleading.

_____

PARRY⊗PFAU

h.   Warranties are consistent with applicable Federal and State law.

43. Failure to comply with just one of the conditions invalidated the CPMA.

44. In addition to the requirements set forth in the CPMA, Defendants are required to comply with all FDA requirements for Class III medical devices, including, but not limited to:

a.   Report to the FDA information suggesting that one of the Manufacturer's devices may have caused or contributed to a death or serious injury, or has malfunctioned and would be likely to cause death or serious injury if the malfunction were to recur, 21 CFR §§ 803.50 et seq.;

b.   Monitor the product after pre-market approval and to discover and report to the FDA any complaints about the product's performance and any adverse health consequences of which it became aware and that are or may be attributable to the product, 21 CFR §§ 814 et seq.;

c.   Submit a PMA Supplement for any change in Manufacturing Site, 21 CFR §§ 814.39 et seq.;

d.   Establish and maintain quality system requirements to ensure that quality requirements are met, 21 CFR § 820.20 et seq.;

e.   Establish and maintain procedures for validating the device design, including testing of production units under actual or simulated use conditions, creation of a risk plan, and conducting risk analyses, 21 CFR §§ 820.30 et seq.;

f.   Document all Corrective Action and Preventative Actions taken by the Manufacturer to address non-conformance and other internal quality control issues, 21 CFR §§ 820.100 et seq.;

g.   Establish internal procedures for reviewing complaints and event reports, 21 CFR §§ 820.198, §§ 820.100 et seq. and §§ 820.20 et seq.;

h.   Establish Quality Management System (QMS) procedures to assess potential causes of non-conforming products and other quality problems, 21 CFR §§820.70 et seq. and 21CFR §§ 820.90 et seq.;

_____

    i.  Report on Post Approval Studies in a timely fashion, 21 CFR §§ 814.80 et seq.; and

    j.  Advertise the device accurately and truthfully, 21 CFR §§ 801 et seq.

45. The PMA for further outlined reporting requirements that Defendants were required to follow under the Medical Device Reporting regulations ("MDR"). Under these requirements, Defendants must:

    a.  Report to the FDA **within thirty days (30) days** whenever they receive or otherwise become aware of information, from any source, that reasonably suggests a device may have caused of contributed to serious injury; and

    b.  Report to the FDA **within thirty (30) days** whenever they receive or otherwise become aware of information, from any source, that reasonably suggests a device had malfunctioned and would be likely to cause or contribute to serious injury if the malfunction were to occur.

46. Defendants were, at all times, responsible for maintaining the labeling of Essure®. Accordingly, Defendants had the ability to unilaterally update the labeling of Essure® to reflect newly acquired safety information without advanced approval by the FDA. 21 C.F.R. § 814.39(d). These changes include:

    a. Labeling changes that add or strengthen a contraindication, warning, precaution, or information about an adverse reaction for which there is reasonable evidence of a casual association;

    b. Labeling changes that add or strengthen an instrument that is intended to enhance the safe use of the device;

    c. Labeling changes that ensure it is not misleading, false, or contains unsupported indications; and

    d. Changes in quality controls or manufacturing that add a new specification or test method, or otherwise provide additional assurance of purity, identity, strength, or reliability of the device.

PARRY⊗PFAU

47. The FDA's Office of Regulatory Affairs ("ORA") is the lead office for all field activities, including inspections and enforcement. During an inspection, ORA investigators may observe conditions they deem to be objectionable. These observations are required to be listed on an FDA Form 483 when the observed conditions or practices indicate that an FDA-regulated product may be in violation of FDA requirements.

48. FDA Form 483s typically are discussed with a company's management team at the conclusion of the inspection. The Form 483 is not an all-inclusive list of every possible deviation from law and regulation. There may be other objectionable conditions that exist that are not cited on the FDA Form 483. Companies must take corrective action to address the cited objectionable conditions and any related non-cited objectionable conditions that exist.

49. The FDCA requires medical device manufacturers like Defendants to maintain and submit information as required by FDA regulation, 21 U.S.C. § 360i, including submitting Adverse Reaction Reports, 21 C.F.R. § 803.50, and establishing internal procedures for reviewing complaints and event reports, 21 C.F.R. § 820.198(a). Specifically, 21 C.F.R. § 803.50 requires a manufacturer to report information no later than 30 days after it is received, from any source, if that information suggest that the device may have contributed to a serious injury, or has malfunctioned and the malfunction would be likely to contribute to a serious injury if it were to recur.

50. The FDA publishes the adverse events and MDRs in a public, searchable Internet database called MAUDE and updates the report monthly with "all reports received prior to the update." The general public, including physicians and patients, may use the MAUDE database to obtain safety data on medical devices.

## V. Defendants' Actions Violated Federal and State Regulations Governing the Device and Also Violated California State Law

51. Defendants have a duty under California law to exercise reasonable care in

– 12 –

warning Ms. Harrison's and/or Ms. Harrison's physicians about the dangers of Essure® that were known or knowable to Defendants at the time of distribution. Defendants here failed to do so.

52. Defendants also have a duty under California law to exercise reasonable care in the manufacture, development, design, marketing, labeling, distributing, and sale of Essure® after it was approved for sale by the FDA in 2002. Defendants here failed to do so.

53. Defendants also had the obligations and the ability under federal regulations to maintain labeling that provides adequate warnings about risks and instructions for use; to ensure that the product was manufactured utilizing Good Manufacturing Practices; to conduct prompt, accurate and thorough post-market surveillance; to take action to ensure that the device can be used safely in accordance with the instructions; to maintain quality controls to adequately address, investigate, and assess the product's performance post-market; and to ensure that any labeling, warning, or representations that Defendants made were not false or misleading in any respect. Defendants' conduct here failed to meet the federal obligations and also violated California law.

54. Following the FDA's approval for expedited review of the Essure® PMA, the FDA inspected Conceptus' manufacturing facility in San Carlos, California during June and July 2002. At the conclusion of the FDA's inspection, the investigators issued a Form 483 to Defendants, reporting that: (1) design outputs identified as essential for the proper functioning of the device were not completely identified; (2) corrective and preventive action activities had not been documented, including implementation of corrective and preventive actions; (3) the procedures addressing verification or validation of corrective and preventive actions were not implemented; and ( 4) certain adverse events were not captured in the data submitted for Essure®'s PMA.

55. A little over six months after receiving FDA approval for Essure®, Conceptus, Inc. entered a three-year Contract Manufacturing Agreement with Venusa, Ltd. On June 20, 2003 to manufacture Essure®.

_____

56. Five days later, on June 25, 2003, the FDA conducted a six-day Post Marketing Approval inspection of Conceptus' San Carlos headquarters and manufacturing facility reviewing procedures, records and processes associated with the four major quality subsystems: Management Controls, Design Controls, Corrective and Preventive Actions, and Product and Process Controls.

57. During the six day inspection, the FDA documented two (2) conditions which it found objectionable and/or constituted violations of the FDCA and related Acts specific to the quality system that were communicated to Conceptus by the FDA via a Form 483 dated July 7, 2003: (1) Conceptus' failure to analyze all quality data sources to identify existing and potential causes of nonconforming product and other quality problems related to the Essure® device; and (2) Conceptus' failure to follow procedures for the control of products that do not conform to specifications. Specifically, raw materials and sub-assemblies (i.e., Inner/Outer Coil Sub-assemblies) were being rejected during manufacturing but no Material Review Reports were initiated/generated for these rejects by the Conceptus. A review of Lot History Reports for the manufacture of Essure® showed raw materials rejected (hand-written) on the Work Order Picklist but was not documented on Quality Assurance Forms which are used to track and trend in-process data to allow determination of unfavorable trends in sources of product and quality. This failure violated 21 C.F.R. § 820.30(h) ("Each manufacturer shall establish and maintain procedures to ensure that the device design is correctly translated into production specifications."). Upon information and belief, these failures continued and contributed to the manufacturing defects in the products implanted in many women, including Ms. Harrison.

58. These objectionable conditions violated the conditions of the Essure® CPMA and federal regulations and requirements governing the post-marketing conduct of Conceptus, including, but not limited to, 21 CFR §§ 820.90 et seq.; 21 CFR §§ 814 et seq; 21 CFR §§ 820.198 et seq.; §§ 820. 100 et seq.; 21 CFR §§ 820.20 et seq.; 21 CFR §§ 820.70 et seq.; 21 CFR §§ 820.184 et seq.; and 21 CFR §§ 820.30. Defendants'

1    conduct separately violated their duties under California law.

2        59. Subsequent to obtaining its CPMA, Conceptus repeatedly became aware of

3    potential quality and failure modes associated with the Essure® devices. For example,

4    Conceptus became aware that the following post-market failures could occur with the

5    device and lead to adverse consequences for the patient:

6        a.  The stainless steel used in Essure® can become un-passivated, which allows

7            it to rust;

8        b.  The nitinol could have a nickel rich oxide, which the body attacks;

9        c.  The "no lead" solder could in fact have trace lead in it;

10       d.  The Galvanic action between the metals used to manufacture Essure®, which

11           causes the encapsulation of the product within the fallopian tubes, could be a

12           continuous irritant to some patients;

13       e.  The nitinol in the devices can degrade due to High Nickel Ion release,

14           increasing the toxicity of the product for patients;

15       f.  Latent manufacturing defects, such as cracks, scratches, and other disruption

16           of the smooth surface of the metal coil, may exist in the finished product,

17           causing excess nickel to leach into the surrounding tissues after implantation;

18       g.  Degradation products of the PET used in the implant can be toxic to patients,

19           inciting both chronic inflammation and possible autoimmune issues;

20       h.  The mucosal immune response to nickel is different than the immune response

21           in non-mucosal areas of the body.

22       60. Upon obtaining knowledge of these potential device failure modes, the

23   Defendants were required under 21 CFR §§820.30 et seq., 21 CFR §§ 820.100 et seq.

24   and the FDA Recognized Consensus Standard ISO 14971 to use this information to

25   routinely update the risk analyses for the Essure® device and take any and all Corrective

26   Action and Preventative Actions ("CAPA") necessary to address non-conformance and

27   other internal quality control issues. Furthermore, Defendants were required to establish

28   Quality Management Systems ("QMS") procedures to assess potential causes of

PARRY⊗PFAU

nonconforming products and other quality problems with the products, such as latent manufacturing defects. 21 CFR §§ 820.70 et seq.; 21 CFR §§ 820.30 et seq. Defendants failed to comply with these and other federal regulations and requirements, thereby jeopardizing the health of patients, including Ms. Harrison.

61. Upon information and belief, failure to establish QMS procedures to assess potential causes of non-conforming products and other quality problems with the Essure® devices resulted in the use of non-conforming materials with latent manufacturing defects that affected production specifications such as coil stiffness that resulted in migration, perforation, breakage and pain. Upon information and belief, these failures leading to manufacturing defects were systemic, ongoing and long-term.

62. On March 24, 2004, Conceptus filed an Express Good Manufacturing Practice ("GMP") Supplement for the addition of a manufacturing site located at Venusa, Ltd. In Chihuahua, Mexico that was approved by the FDA on April 8, 2004.

63. During the pre-announced FDA Inspection conducted in San Carlos on September 2005 only two of the four subsystems reviewed in the 2003 inspection were covered; Corrective and Preventive Actions and Management Controls. The FDA inspector noted in her Establishment Inspection Report under Manufacturing/Design Operations section that in 2004, Conceptus transferred all manufacturing and no longer manufactures the product on-site but the finished product went through quality control inspection and quality assurance testing at the San Carlos facility. There is no indication that the FDA was aware of this fact previously, indeed, upon information and believe, the FDA was not informed of this by Conceptus. Product and Process Controls were not investigated by the FDA during this investigation.

64. On November 7, 2005, Accellent Corp., f/k/a Venusa, Ltd. entered a three-year Supply Agreement with Conceptus to manufacture Essure® at their facility in Juarez, Mexico.

65. In November or December 2005, Conceptus moved its manufacturing facility from San Carlos, California to Mountain View, California. It did not file the requisite PMA

_____

PARRY⊛PFAU

Supplement advise the FDA of the change in manufacturing site in violation of its post-marketing duties under 21 CFR § 814.39. 39. Noticeably, this failure resulted in Conceptus avoiding inspection of the facility and its manufacturing process for years.

66. Although Conceptus had transferred all manufacturing in 2004 to Chihuahua, Mexico, it wasn't until June 25, 2007 that Conceptus sought approval from the FDA for a manufacturing site change from Conceptus, Inc. in Mountain View, California to its contract manufacturer, Accellent Corp., in Chihuahua, Mexico. It did not file the requisite PMA Supplement to advise the FDA of the change in a manufacturing site in violation of its post-marketing duties under change in a manufacturing site in violation of its post-marketing duties under 21 C.F.R. § 814.39. Notably this failure resulted in Conceptus avoiding inspection of the facility and its manufacturing process for years.

67. On June 10 and 11, 2008, the California Department of Public Health, Medical Device Safety Section ("CDPH"), conducted an inspection of Conceptus' 331 East Evelyn Avenue location in Mountain View, California.

68. During the FDA Inspection conducted July 2008, only Corrective and Preventive Actions and Design Controls were covered. Again, Product and Process Controls were not reviewed by the FDA during this investigation.

69. During this 2008 inspection, the CDPH issued a Notice of Violation to Conceptus for: (1) failing to obtain a valid license to manufacture medical devices after Conceptus moved from its previous location in 2005; and (2) failing to maintain its procedure for inventory transfer.

70. Defendants' conduct violated these FDA regulations and good manufacturing practices and separately violated its duties under California state law, thereby jeopardizing the health of patients, including Ms. Harrison.

71. Consistent with a pattern of systematic manufacturing processes' violations, on or about December 2010, the FDA conducted a fifteen day "For Cause" inspection of the Conceptus facility. The purpose of the inspection was to investigate a specific problem that had come to the FDA's attention.

_____

72. During the fifteen day For Cause Inspection, the FDA noted four conditions which it found objectionable and/or constituted violations of the FDCA and federal regulations and requirements. The four objectionable conditions were communicated to Conceptus by the FDA via a Form 483 dated January 6, 2011, and included:

    a.  Conceptus' failure to submit Medical Device Reporting ("MDR") determinations to the FDA within 30 days for reports of a serious injury involving the Essure® device, including but not limited to two reports of bowel perforation, and one report of pain and the Essure® device breaking into pieces immediately following implant and 41 complaints that involved perforation of the uterus or fallopian tubes;

    b.  Conceptus' failure to submit MDR's to the FDA within 30 days for reports of a serious injury involving the Essure® device including but not limited to eight reports of the Essure® coils perforating the fallopian tubes and penetrating the peritoneal cavity;

    c.  Conceptus' failure to submit MDR's to the FDA reports of perforation with a post-procedural radiograph (HSG or CT) showing a coil in the abdominal or peritoneal cavity;

    d.  Conceptus' failure to include perforation of the Essure® micro-coil insert into the peritoneal cavity in its Design Failure Mode Effects Analysis (DFMEA) for Essure®, despite having documented at least 508 complaints of perforation involving the Essure® device; and

    e.  Conceptus' failure to submit MDR's to the FDA for reports of the device failing to function as specified in the PMA and would be likely to cause or contribute to serious injury; and

    f.  Conceptus' failure to adequately document in a CAPA an incident involving the erroneous use of uncertified material by Conceptus' contract manufacturer in a validation protocol and non-conformity of the contract manufacturer not following their own Standard Operating Procedure for control of non-

– 18 –

conforming material. Upon information and belief, these failures resulted in manufacturing defects that harmed those implanted, including Ms. Harrison's.

73. The FDA Establishment Inspection Report for the inspection that ended on January 6, 2011 states the following:

a. "My inspection of the complaint system of Conceptus Inc. found that the firm was not reporting complaints of loose micro-insert coils in the peritoneal or abdomino-pelvic cavity (See FDA483 Observation #2) …. In some of these cases the micro-insert coil will migrate through the perforation in the tube and will be found on x-ray to be outside the female reproductive tract in the peritoneal cavity. Such cases will be reported as an MDR by the firm if the patient is complaining of pain and a second procedure is required to remove the coil. However, the firm will not report such complaints if an abdominal located coil is removed during a laparoscopic tubal ligation performed because of failure of the Essure® procedure."

b. During this inspection, Conceptus gave the FDA inspector "an Excel spreadsheet with all the complaints opened since Jan. 1, 2008 [and] there were 16,581 complaint[s] from 1/1/08 until 12/6110 listed. There were 182 MDRs reported in the same time period."

c. Conceptus also gave the FDA inspector a more detailed complaint spreadsheet "that starts at 7/20/2010 and goes to 12/10/2010. That spreadsheet [had] a total of 2,752 complaints."

d. The FDA inspector looked at the complaints for perforation and noted that "none of the perforation complaints were reported as MDRs."

e. A review of the Risk Analysis Design Failure Mode Effects Analysis showed that it referenced perforation as a possible effect of the failure mode of the coil being too stiff, an explanation to how the manufacturing defects caused perforation, but migration as a failure mode was not addressed.

74. The FDA inspector specifically advised Defendants that any instances of the device

– 19 –

1  migrating to, perforating, or penetrating areas in the body outside of the fallopian tubes
2  (its intended permanent placement) constituted a malfunction and should be reported.
3  Upon information and belief, just as Defendants were not reporting such instances as
4  MDRs, they were also not analyzing them as a failure mode in Design Controls, nor were
5  they performing their post-market obligations to ensure that the Essure® device was
6  safe and effective was safe and effective as manufactured and in accordance with the
7  requirements of the CPMA and FDA Regulations.

8      75. Defendant's failure to establish and maintain procedures to ensure that the device
9  manufacture properly followed the approved product specifications for the Essure®
10  device – particularly related to non-conforming material, and the inadequate quality
11  assurance and failure mode analysis – well-documented throughout reports by the FDA
12  at Defendants' various manufacturing facilities over multiple years, resulted in systematic
13  manufacturing defects causing harm to many women, including Ms. Harrison. Upon
14  information and belief, these failures were ongoing and systematic, occurring and
15  resulting in manufacturing defects in the product up to at least August 2015 when the
16  Defendants opened their new Cosa Rica manufacturing facility.

17     76. These actions violated the conditions of the Essure® CPMA and federal
18  regulations and requirements governing the post-marketing conduct of Conceptus,
19  including, but not limited to, 21 CFR §§ 803.50 et seq; 21 CFR §§ 814 et seq; 21 CFR §§
20  820.30 et seq; and 21 CFR §§ 820.198; 21 CFR §§ 820.100 et seq; and 21 CFR §§ 820.20.
21  Defendants' actions also separately violated duties under California law governing the
22  post-marketing conduct of Conceptus.

23     77. Upon information and belief, failure to establish and maintain procedures to ensure
24  that the device properly conformed to approved product specifications for the Essure®
25  device – particularly related to non-conforming material, and inadequate quality
26  assurances and failure mode analysis resulted in the ongoing and systematic use of non-
27  conforming materials with latent manufacturing defects. Defendants' failure to analyze
28  manufacturing defects that affected production specifications such as coil stiffness that

– 20 –

_____

1    resulted in migration, perforation, breakage and pain.

2    78. In May and June 2013, the FDA conducted another inspection that included an
3    evaluation of Conceptus'/Defendants' complaint handling and adverse event reporting
4    practices. During that inspection, the FDA inspector requested a complete list of
5    complaints since January 2011. Defendants provided the FDA inspector with a
6    spreadsheet that contained 16,047 complaints from January 2011 to May 2013.

7    79. The inspector reviewed 29 random complaint forms received by Defendants. Of
8    all the randomly reviewed complaints in which one or more coils were imaged outside of
9    the fallopian tubes, none were reported to the FDA as MDRs.

10   80. Upon information and belief, from January 1, 2008 through May 2013, Defendants
11   were receiving on average over 15 complaints per day regarding their product, and
12   thousands of complaints each year. Defendants timely reported only a tiny fraction of
13   these complaints to the FDA.

14   81. Defendants' actions violated the conditions of the Essure® CPMA and federal
15   regulations and requirements governing the post-marketing conduct of Defendants,
16   including, but not limited to, 21 CFR §§ 803.50 et seq.; 21 CFR § 820.198; 21 CFR §§
17   820.100 et seq.; and 21 CFR §§ 820.20 et seq. Defendants' actions also separately
18   violated duties under California law governing their post-market conduct.

19   82. Defendants has unique knowledge concerning the frequency, severity and
20   permanence of the complications and risks associated with the Essure® device. Despite
21   this unique knowledge, as outlines above, Defendants failed to unilaterally update its
22   labeling through the CBE Process to advise Essure® users of the defects and risks
23   described above.

24   83. Defendants' actions violated the conditions of the Essure® CPMA and federal
25   regulations and requirements governing the post-marketing conduct of Defendants,
26   including, but not limited to, 21 CFR §§ 8814.39(d) et seq. Defendants' actions also
27   separately violated duties under California law governing their post-market conduct.

28   84. Conceptus also failed to timely submit Post-Approval Studies under the Essure®

PARRY⊗PFAU

1 CPMA. The six-month report was due on August 24, 2012 but was not received by the
2 FDA until December 14, 2012; the one year report was due February 23, 2013 but was
3 not received by the FDA until March 8, 2013; and the eighteen-month report due August
4 24, 2013 but was not received by the FDA until September 12, 2013.

5 85. These actions violated the conditions of the Essure® CPMA and federal regulations
6 and requirements governing the post-marketing conduct of Conceptus, including, but not
7 limited to, 21 CFR §§ 814.80 et seq. Defendants' actions also separately violated duties
8 under California law governing their post-market conduct.

9 86. According to the FDA Inspection Classification Database Search, Accellent Inc.
10 d/b/a Lake Region Medical Inc. in Juarez, Mexico was not inspected until August 7, 2014
11 when it was again issued a 483 after again finding objectionable conditions or practices.

12 87. On June 9, 2015, the FDA approved a manufacturing site located at Bayer
13 Healthcare SRL in Heredia, Costa Rica and the facility was officially opened on August 27,
14 2015.

15 88. The FDA also requires that upon purchase of a company holding a CPMA, the
16 CPMA sponsor "must submit a PMA amendment to notify the FDA of the new owner...
17 The... supplement should include: the effective date of the ownership transfer; a
18 statement of the new owner's commitment to comply with all the conditions of approval
19 applicable to the PMA; and either a statement that the new owner has a complete copy
20 of the PMA including all amendment, supplements, and reports or a request for a copy
21 from the FDA files."

22 89. However, no PMA supplement notifying the FDA of Conceptus' (and the Essure®
23 CPMA's) change of ownership after Conceptus was acquired by Defendants was
24 submitted. These actions violated the conditions of the Essure® CPMA and federal
25 regulations and requirements governing the post-marketing conduct of Conceptus,
26 including, but not limited to, 21 CFR §§ 814.39 et seq. Defendants; actions also separately
27 violated duties under California law governing their post-market conduct.

28 90. As presented above, Defendants failed to comply with several of the

PARRY⊗PFAU

aforementioned conditions of the CPMA and federal regulations, thereby invalidating the CPMA.

91. By failing to update their labeling as new post-marketing information became available to ensure that its labeling remained both accurate and adequate, Defendants also rendered Essure® a "misbranded" device under the FDCA and thus not allowed to be marketed. Despite this, Defendants continued to improperly market Essure® for use in women, including Ms. Harrison, at the time that they were prohibited from doing so under federal law. Defendants' actions separately violated duties under California law governing their post-market conduct.

92. Defendants' failure to timely file MDRs and to report to the FDA complaints not addressed by the device's labeling and/or complaints that were occurring with an unexpected increase in severity and frequency, which defendants knew of from the more than 32,000 complaints they received, violated the CPMA, FDA post-marketing regulations, and parallel state law. Defendants' violations prevented Plaintiffs, their physicians, and the public from understanding the true nature of Essure®'s adverse events, risks and ineffectiveness.

93. Defendants' actions violated duties under California law governing their post-market conduct.

## VI. Defendants' Engagement in False and Misleading Sales and Marketing Tactics

94. Defendants violated the Essure® CPMA and §§ 502(q) and (r) of the FDCA by engaging in false and misleading advertising of Essure®.

95. Defendants continue to sell their product with misleading and false advertising in violation of the conditions of the Essure® CPMA and state laws.

96. The marketing campaign for Essure® was described as follows: "Through the use of public relations and targeted advertising, we intend to increase awareness of Essure® among consumers, general practitioners and the broader medical community. In April 2003, we presented Essure® at the annual conference of the American College of

Obstetricians and Gynecologists. At this meeting, we had two presentations and there was a Continuing Medical Education, or CME, accredited symposium with Essure® as the main topic. In early June 2003, we commenced a direct mail campaign to 500,000 women in the Atlanta and Chicago areas, with the goal of encouraging these women to contact our call center for additional information. In turn, our call center has the ability to offer a referral to a practicing Essure® physician in a consumer's area. We had also conducted regional advertisement in a variety of magazines, such as *Parents* and *Self*."

97. In addition, Defendants operated websites for "physicians and patients" and "established a call center for patients that are seeking additional information about Essure® and who wish to be referred to physicians that are trained to perform the Essure® procedure. Physicians that we refer our patients to are those that have chosen to participate in our Essure® Accredited Practice program aimed at providing an optimal patient experience." In reality, the training and medical comprehensiveness of the Essure® Accredited Practice program is a falsehood.

98. Defendants advertised, promoted and marketed on its website, in its print and/or video advertisements, brochures and fact sheets the following representations about Essure®, while failing to report the actual material facts:

    a. The Essure® patient brochure stated Essure® was the "[o]nly FDA approved female sterilization procedure to have zero pregnancies in the clinical trials" or words to that effect. However, there were actually four pregnancies during the clinical trials and five pregnancies during the first year of commercial experience. Additionally, several pregnancies have been reported subsequent to Essure® implantation. Between 1997 and 2005, 64 pregnancies were reported to Defendants. Adverse Event Report ESS 205 dated October 3, 2006 evidences a pregnancy after the three-month Confirmation Test was confirmed. Furthermore, a recent study indicates that women implanted with Essure® have a ten times greater risk of pregnancy after one year than those who use laparoscopic sterilization. At ten years, the risk of pregnancy is almost four

1    times greater.

2    b.   The Essure® website, print advertising, and patient brochure described

3    Essure® as a "[s]urgery-free" permanent birth control option, or words to that

4    effect. However, Essure® is not "surgery-free." All Essure® procedures are

5    done under hysteroscopy, which is a surgical procedure. Defendants also failed

6    to disclose post-market adverse events arising from the implant, and that many

7    of those events required surgery to remove the device. In reality, a recent

8    controlled study of device found that women who were implanted with the

9    Essure® were 10 times more likely to need reoperations over women who had

10    tubal ligations.

11    c.   The Essure® website, print advertising, and patient brochure described

12    Essure® as "[w]orry free," and a "simple procedure performed in your doctor's

13    office" that takes "less than 10 minutes" and "requires no downtime for

14    recovery" and "Essure® eliminates the risks, discomfort, and recovery time

15    associated with surgical procedures" or words to that effect.   However,

16    Defendants actively concealed and failed to report complaints of perforations

17    and pain which occurred as a result of Essure® as noted above. Essure® can

18    cause women serious, life-altering complications including but not limited to

19    debilitating pain, heavy bleeding necessitating medication and/or additional

20    surgical procedures, allergic reactions (including but not limited to rashes,

21    itching, bloating, swelling, headaches, and hair loss), autoimmune disorders,

22    dyspareunia, hysterectomy, and other complications. Defendants failed in their

23    post-market obligations to monitor and report these serious adverse events.

24    d.   The Essure® website, print advertising, and patient brochure stated "[t]he

25    Essure® inserts stay secure, forming a long protective barrier against

26    pregnancy. They also remain visible outside your tubes, so your doctor can

27    confirm that they're properly in place" or words to that effect. However, the

28    micro-inserts do not necessarily remain secure and can migrate and be

PARRY⊗PFAU

expelled by the body, as evidenced by the multiple complaints concerning perforation that were inadequately monitored and not reported by the Defendants.

e.  The Essure® website, print advertising, and patient brochure stated "[t]he Essure® inserts are made from the same trusted, silicone free material used in heart stents" or words to that effect. However, the micro-inserts are not made from the same material as heart stents and do not elicit tissue growth. Specifically, the micro-inserts are made of PET fibers which trigger inflammation and scar tissue growth. PET fibers are not designed or manufactured for use in human implantation. Moreover, Defendants also warranted: "the long-term nature of the tissue response to the Essure® micro-insert is not known." The Essure® inserts also contain nickel, which can cause severe reactions in patients.

f.  The Essure® website, print advertising, and patient brochure stated "Essure® eliminates the risks, discomfort, and recovery time associated with surgical procedures." However, Essure® is not "surgery-free" and can cause women serious, life-altering complications including but not limited to debilitating pain, heavy bleeding necessitating medication and/or additional surgical procedures, allergic reactions (including but not limited to rashes, itching, bloating, swelling, headaches, and hair loss), autoimmune disorders, dyspareunia, hysterectomy, and other complications. Defendants failed in their post-market obligations to monitor and report these serious adverse events.

g.  The Essure® website, print advertising, and patient brochure stated "Essure® is the most effective permanent birth control available - even more effective than tying your tubes or a vasectomy" or words to that effect. Yet, Defendants' SEC Form 10-K filing shows that Defendants never did a comparison to a vasectomy or tubal ligation. Defendants stated, "We did not conduct a clinical trial to compare the Essure® procedure to laparoscopic tubal ligation."

_____

FIRST AMENDED COMPLAINT

h. The Essure® website claims "[c]orrect placement...is performed easily because of the design of the micro insert" or words to that effect. However, Defendants admitted that placement of the device requires a "skilled approach" and even admitted that their own experts in hysteroscopy (as compared to general gynecologists not on the same level as an expert hysteroscopist) failed to place the micro-inserts in one out of seven clinical participants. Moreover, Defendants failed to warn of the dangers associated with the hysteroscopic procedure, a necessary part of implantation of the device.

99. Doctors and patients, including Ms. Harrison and her implanting physicians, relied on these misrepresentations by Defendants.

100.     Defendants advertised, promoted, and marketed on its websites, in print and/or video advertisements, brochures, and fact sheets the following about physicians performing the Essure® procedure, while failing to report the actual material facts:

a. "An Essure® trained doctor inserts spring-like coils, called micro-inserts" and "[p]hysicians must be signed-off to perform Essure® procedure" or words to that effect. However, Defendants failed to adequately train the implanting physician and "signed-off' on implanting physicians who did not have the requisite training.

b. The "Essure® training program is a comprehensive course designed to provide information and skills necessary to select appropriate patients, perform competent procedures and manage technical issues related to the placement of Essure® micro-inserts for permanent birth control" or words to that effect. However, Defendants failed to adequately train the implanting physician.

c. "[i]n order to be trained in Essure® you must be a skilled operative hysteroscopist. You will find the procedure easier to learn if you are already proficient in operative hysteroscopy and management of the awake patient. If your skills are minimal or out of date, you should attend a hysteroscopy course before learning Essure®" or words to that effect. However, Defendants "signed

– 27 –

_____

FIRST AMENDED COMPLAINT

PARRY⊗PFAU

off' on physicians who were not skilled operative hysteroscopists, in order to monopolize and capture the market, including the implanting physician, and often utilized sales representatives to "train" physicians.

d. "In order to be identified as a qualified Essure® physician, a minimum of one Essure® procedure must be performed every 6-8 weeks" or words to that effect. However, Defendants "signed off" on "Essure® physicians" who did not perform the procedure every 6-8 weeks.

e. The Essure® physician training manual states "[t]he PET fibers are what caused the tissue growth," and Essure® "works with your body to create a natural barrier against pregnancy" or words to that effect. However, during the PMA meeting with the FDA in 2002, Defendants represented that the trauma caused by the expanding coil striking the fallopian tubes is what causes the inflammatory response of the tissue.

101.    Contrary to Defendants' representations, there was no meaningful Essure® training program provided to, let alone required for, prospective implanting physicians, including Ms. Harrison's physician, to complete prior to selling its Essure® system. Defendants sold its Essure® system without regard to physicians' knowledge, training, or experience with hysterocopes and the Essure® system itself, including, but not limited to the Essure® Instructions for Use and Physician Training Manual.

102.    Doctors and patients, including Ms. Harrison and her implanting physician, relied on these omissions and/or misrepresentations by Defendants.

103.    In its CPMA, the FDA explicitly declined to approve any warranties made by Defendants, such as those set forth herein, stating: "CDHR does not evaluate information related to contract liability warranties, however you should be aware that any such warranty statements must be truthful, accurate, and not misleading, and must be consistent with applicable Federal and State laws."

**VII. The FDA Hearings and Resulting FDA Action**

104.    Defendants not only violated federal regulatory duties and duties under

– 28 –

California law, but also buried a massive amount of information that should have been shared with the medical and scientific community and the public. Because the Defendants failed to timely, completely, or accurately report their knowledge of the risks and complications associated with the Essure® device, the public's knowledge of the risks associated with the Essure® device were seriously hampered and delayed. This endangered patient safety, including Ms. Harrisons' safety.

105.    As the FDA continued to force Defendants to provide additional information known to them that had been withheld, more information belatedly was made known to the medical community, including information concerning the frequency, severity and permanence of complications associated with the prescription and implementation of the Essure® device.

106.    This belated and untimely release of relevant and important information led to an increasing number of adverse events being reported to the FDA about Essure® from patients and physicians. Because of these complaints, the FDA convened a public hearing concerning the safety and efficacy of the Essure® device on September 24 and 25, 2015. At that public hearing, Defendants continued to misrepresent the safety and efficacy of Essure®:

    a.    Defendants testified that efficacy rates for Essure® are 99.6%; in reality, studies show that the chances of becoming pregnant with Essure® are higher than with tubal ligations and higher than the rates reported by Defendants to the FDA at the public hearing;

    b.    Defendants testified that skin patch testing is not a reliable predictor of clinically significant reactions to nickel-containing implantable devices, including Essure®. Despite this, Defendants told physicians and patients that a nickel sensitivity test was sufficient to determine whether a patient was a suitable candidate for an Essure® device.

    c.    Defendants testified that "[a]s an alternative to Essure®, laparoscopic tubal ligation is a safe and effective method of permanent birth control." In reality,

PARRY⊗PFAU

studies show that the chances of becoming pregnant with Essure® are higher than with tubal ligations, and Essure® patients are much more likely to require additional surgeries to correct complications associated with the sterilization procedure.

d.   Defendants testified that most of the reports of adverse events to the FDA have come from consumers and not Defendants, which is unusual. In reality, Defendants failed to report thousands of complaints of adverse events that it had received.

107.   On February 29, 2016, the FDA announced "actions to provide important information about the risks of using Essure® and to help women and their doctors be better informed of the potential complications associated with" the device. The FDA took the following actions:

a.   The FDA is requiring a black box warning on Essure® to warn doctors and patients of "reported adverse events, including perforation of the uterus and/or fallopian tubes, intra-abdominal or pelvic device migration, persistent pain, and allergy or hypersensitivity reactions." The FDA draft guidance black box warning for Essure® also warns: "Some of these reported events resulted in device removal that required abdominal surgery. This information should be shared with patients considering sterilization with the Essure device during discussion of the benefits and risks of the device."

b.   The FDA is requiring Defendants to implement a Patient Decision Checklist "to help to ensure women receive and understand information regarding the benefits and risks" of Essure®. The FDA's draft Patient Decision Checklist is a five-page document that the physician will discuss with each patient interested in using the device. The patient must initial after each topic of discussion, and both the physician and patient must sign the document. The topics for discussion include, *inter alia,* the risks for "adverse events including persistent pain, device puncture of the uterus and/or fallopian

– 30 –

_____

FIRST AMENDED COMPLAINT

tubes ('perforation'), or movement of the device into the abdomen or pelvis ('intra-peritoneal migration')"; "allergy or hypersensitivity reactions"; symptoms such as changes in skin (rash, itching), "chest pain, palpitations, breathing difficulties or wheezing, and intestinal discomfort such as nausea, diarrhea, and vomiting"; 'joint or muscle pain, muscle weakness, excessive fatigue, hair loss, weight changes, and mood changes"; the fact that "there is no reliable test to predict ahead of time who may develop a reaction to the device"; the possibility that the Essure® device "can move after placement," possibly becoming ineffective at preventing pregnancy or leading to "serious adverse events such as bleeding or bowel damage, which may require surgery to address"; and the fact that if the Essure® device has to be removed after placement, it will require surgery to remove and possibly a hysterectomy.

c.    The FDA has also ordered Defendants "to conduct a new post market surveillance study designed to provide important information about the risks of the device in a real-world environment." The study must provide data on "the risks associated with Essure® and compare them to laparoscopic tubal ligation. This includes the rates of complications including unplanned pregnancy, pelvic pain and other symptoms, and surgery to remove the Essure® device. The study will also evaluate how much these complications affect a patient's quality of life. … The FDA will use the results of this study to determine what, if any, further actions related to Essure® are needed to protect public health."

108.    Unfortunately, this new warning, labeling, and patient decision checklist came too late to warn the consuming public, including Ms. Harrison, of the true risks of Essure®. Had the Defendants complied with their federal regulatory duties and their duties under California law by adequately assessing the true risks of their device and appropriately reporting the known risks and complications in a timely fashion, the Plaintiff

and her physicians would have had this relevant, critical information available to them prior to the implant of the Essure® device.

109.    113. At all relevant times, Defendants' Essure® product was prescribed and used as intended by Defendants and in a manner reasonably foreseeable to Defendants.

## VIII. Ms. Harrison's History

110.    On or around September 2010, Ms. Harrison visited her healthcare professional to discuss permanent forms of birth control. Ms. Harrison's doctor began to discuss a new form of birth control, called Essure®.

111.    Ms. Harrison's physician then discussed all the selling features of the device listed in company advertisements and commercials, including the representation that this new procedure is just as effective as the standard methods without the need for surgery and with no additional risk. During this time, Ms. Harrison was not warned of the risk that the device can break or migrate, be expelled, and cause other complications, including, but not limited to, severe complications requiring surgical removal of this permanent implant.

112.    After considering the selling points in the Defendants' brochure, Ms. Harrison made the decision to undergo the Essure® implant, as opposed to the standard tubal ligation procedure. On or around September 20, 2010, Ms. Harrison had the Essure® device implanted as a permanent birth control option.

113.    The implantation procedure was expected to be performed in less than 10 minutes. However, the implantation procedure was performed over the three hours, in which Ms. Harrison experienced heavy bleeding, severe pain, and received an adrenaline shot due to her fainting.

114.    Due to the Essure® device, Ms. Harrison suffered from excruciating chronic and abdominal pain, heavy bleeding, multiple fibroids, nickel poisoning and the migration of her device coil to her uterus due to the coil breaking and perforating her uterus.

115.    On September 8, 2015, the Essure® device was explanted from her vagina and her cervix, uterus, and fallopian tubes were removed.

_____

PARRY⊗PFAU

116.     During the procedure, Ms. Harrison was forced to undergo a laparscopically assisted vaginal hysterectomy with bilateral salpringectomy to remove the Essure® coils in Newport Beach, County of Orange, California.

117.     The severe and painful symptoms that necessitated Ms. Harrison's removal surgery and other complications identified herein and/or which will be established by the records were directly and proximately caused by Defendants' failure to disseminate truthful, accurate, and adequate information regarding the risk profile of Essure®.

118.     All the treatment necessitated by the defective Essure® product has forced Plaintiff to incur significant pain and suffering and economic damages, including but not limited to lost wages and lost earning capacity.

119.     In or around December 2014, Ms. Harrison learned that many other women had been suffering from problems with Essure® like her own. This was the first time Ms. Harrison learned of any alleged defects related to Essure®.

120.     Prior to December 2014, Ms. Harrison did not have knowledge of facts that would lead a reasonable, prudent person to inquire or discover Defendants' tortious conduct. Under appropriate application of the discovery rule, Plaintiff's suit was filed well within applicable statutory limitations period.

121.     Ms. Harrison exercised reasonable diligence in investigating potential causes of her injury by discussing her injuries with healthcare providers. None of the conversations with her healthcare providers gave Ms. Harrison a reason to suspect, or reasonably should have given Ms. Harrison a reason to suspect, that the Essure® products implanted in her were defective.

122.     Ms. Harrison was not given a hypersensitivity nickel allergy skin test by her doctor. The Essure® system should not have been recommended or marketed to patients with a suspected or previous diagnosis of hypersensitive nickel allergy, including Ms. Harrison. Defendants should ensure the safety of their consumers by providing an allergy test before the implantation of the device.

123.     Ms. Harrison would not have elected to have the Essure® device implanted

– 33 –

_____

1    if Defendants had appropriately warned the public and physicians, including the reporting
2    adverse events to the FDA as required by regulation, about the types of complications
3    associated with the Essure® device.

4    124.    Ms. Harrison did not have knowledge of facts that would lead to a reasonable,
5    prudent person to inquire or discover Defendants' tortious conduct. Defendants'
6    misconduct and fraudulent concealment of the relevant facts deprived Ms. Harrison and
7    her physician of vital information essential to the pursuit of these claims, without any
8    fault or lack of diligence on their part.

9    125.    Defendants' are and were under a continuing duty to monitor and disclose
10   the true character, quality and nature of Essure®. Because of Defendants' misconduct
11   and fraudulent concealment of the true character, quality and nature of its device,
12   Defendants are estopped from relying on any statue of limitations defense.

13

14                     **First Cause of Action**
15                   **(Negligent Failure to Warn)**

16   126.    Ms. Harrison repeats, realleges and incorporates by reference the preceding
17   paragraphs as if fully set forth herein and further alleges as follows:

18   127.    Defendants had a duty under California law to exercise reasonable care in
19   warning the public, including Ms. Harrison and her implanting physician, about the risks
20   and dangers of Essure® that were known or knowable to Defendants at the time of
21   distribution.

22   128.    As set forth, Defendants breached their duty in that they failed to timely warn
23   Ms. Harrison and her physicians by, among other things, not timely reporting the risk of
24   serious defects and life-altering complications described herein that they knew or should
25   have known were associated with Essure®; failing to timely communicate adverse events
26   to the FDA, including the roughly 32,000 complaints that it had internally received about
27   Essure®; and failing to inform physicians and patients about known and knowable
28   complications through their product labeling.

PARRY⊗PFAU

129.     Had the Defendants timely and adequately reported the adverse events to the FDA, it would have effectively warned physicians of those adverse events both directly and through discussion of those events that would have followed in the literature and at meetings. Thus, additional information would have been available to the public, including Ms. Harrison and/or Ms. Harrisons physician, regarding the dangers of Essure® that were known or knowable to Defendants at the time of distribution.

130.     In this case, once the medical community and the FDA became aware of the undisclosed adverse events, the FDA held a public hearing discussing the risks and benefits of the device and then required a black box warning and Patient Decision Checklist for Essure® that warns of many of the same injuries that Ms. Harrison has experienced due to Essure®.

131.     Defendants' delay in timely reporting their known complications prevented Ms. Harrison and her physicians from having timely information concerning the real life risks associated with the Essure® device. Had Ms. Harrison received timely and adequate information of these serious risks and adverse events, she would not have agreed to the Essure® implant.

132.     Defendants breached their duty of care to Ms. Harrison under California law and caused Ms. Harrison's past and future suffering, including severe physical injuries, severe emotional distress, mental anguish, economic loss, and other injuries for which she is entitled to compensatory and other damages in an amount to be proven at trial.

133.     Wherefore, Ms. Harrison prays for judgment against Defendants as hereinafter set forth.

## Second Cause of Action

### (Negligence)

134.     Ms. Harrison repeats, realleges and incorporates by reference the preceding paragraphs as if fully set forth herein and further alleges as follows:

135.     Defendants had a duty under California law to exercise reasonable care in the manufacture, development, marketing, labeling, distributing, and sale of Essure®

1    after it was approved for sale by the FDA in 2002.

2        136.    Defendants also had a duty under California law to exercise ordinary care in

3    the manufacture of Essure® consistent with FDA specifications, the Essure® CPMA,

4    and/or conditions of approval.

5        137.    The Essure® device contained a manufacturing defect when it left

6    Defendants' possession, in that Defendants' manufacturing process did not conform to

7    the CGMP design controls enumerated in 21 C.F.R. § 820.30. When the facilities where

8    Essure® was being manufactured were actually inspected by the FDA for Product and

9    Process Controls, ongoing and systematic failures related to the control or non-

10   conforming materials was documents, in both 2003 at Conceptus in Mountain view,

11   California and in 2011 at Defendants' contract manufacturer facility in Mexico in violation

12   of 21 C.F.R. § 820.30(f).

13       138.    As set forth above, Defendants breached their duties under California law by,

14   among other things: (1) manufacturing actual Essure® devices that differ from the

15   specifications set forth in the CPMA, its Supplements, the Conditions of Approval and/or

16   other federal regulations; (2) failing to correctly monitor its products to ensure that it

17   complied with appropriate quality control procedures and to track non-conforming

18   products; (3) failing to conduct regular risk analysis of its Essure® device, including a

19   Design Failure Analysis, and failing to include and consider known complications from the

20   device as part of its risk analysis processes and failing to exercise appropriate post-market

21   quality controls; (4) failing to provide the FDA with timely post-approval reports for its

22   six month, one year, eighteen month, and two-year report schedules; (5) failing to comply

23   with applicable federal and state regulations; (6) failing to adequately train Defendants'

24   employees who provided recommendations and advice to physicians who implanted the

25   device; (7) making false, inaccurate and misleading statements concerning the properties

26   and effects of the Essure® device; and (8) failing to properly train and educate physicians

27   on the use of the Essure® device.

28       139.    Defendants also undertook a duty under California law to certify and train

physicians on the proper use and surgical technique associated with the Essure® device.

140.    Defendants knew or should have known that consumers such as Ms. Harrison, physicians, the medical community, and the public, would reasonably rely on the false, inaccurate and misleading statements concerning the properties and effects of the Essure® device.

141.    Defendants disseminated the false information, as referenced above, to physicians, the medical community, and the public with the intention to deceive physicians and their patients and to induce the physicians to prescribe Essure®.

142.    Ms. Harrison and her physicians did in fact reasonably rely on Defendants' negligent misrepresentations, as Defendant intended. Specifically, Ms. Harrison would have never had the Essure® implanted had she been aware that there had been over 30,000 complaints regarding Essure®, or the falsity of the representations specifically delineated in the preceding paragraphs.

143.    Defendants knew or should have known that consumers such as Ms. Harrison would foreseeably suffer injury as a result of Defendants' failure to exercise ordinary care as described above.

144.    Had Defendants exercised ordinary care, and complied with the then existing standards of care, Ms. Harrison would not have been injured.

145.    Defendants failed to adequately inspect, test and validate the materials and components used in the manufacture and assembly of Essure®.

146.    Defendants failed to adequately inspect, test and validate Essure® after completion of assembly and immediately before delivery to Ms. Harrison.

147.    Because Defendants failed to follow specifications, regulations, and required Good Manufacturing Practices, Ms. Harrison's Essure® coils became unpassivated, making it vulnerable to degradation, deterioration, migration, leaching, breakage, and fragmentation.

148.    Upon information and belief, when Essure® was manufactured, Defendants had the technological capability to manufacture Essure® in a reasonably safe manner

1  and is held to the level of knowledge of an expert in the field.

2      149.    Ms. Harrison was implanted with the Essure® device in 2010. Defendants
3  had been cited approximately just one year later by the FDA for failure to report
4  complications it knew were associated with Essure®; had been cited by the FDA within
5  the prior year for failure to perform an appropriate Risk Analysis Design Failure Mode
6  Effects Analysis and to undertake Corrective and Preventative Action to address
7  manufacturing defects; and had been cited by the FDA within the prior year for use of
8  uncertified materials and non-conformity of the contract manufacturer for not following
9  their own SOP for control of non-conforming material. These manufacturing violations
10  affecting the manufacturing quality of the Essure® were not isolated events but
11  represented ongoing, systematic, and widespread conduct by Defendants that signified
12  problems with the manufacturing process starting before Ms. Harrison received her
13  Essure® implant and continuing through at least August 2015.

14      150.    As a proximate and legal result of Defendants' failure to exercise reasonable
15  care and the resulting defective condition of Essure®, Ms. Harrison suffered and will
16  continue to suffer severe physical injuries, severe emotional distress, mental anguish,
17  economic losses and other injuries for which she is entitled to compensatory and other
18  damages in an amount to be proven at trial.

19      151.    Wherefore, Ms. Harrison prays for judgment against Defendants as
20  hereinafter set forth.

21                        **Third Cause of Action**

22                        **(Strict Products Liability)**

23      152.    Ms. Harrison repeats, realleges and incorporates by reference the preceding
24  paragraphs as if fully set forth herein and further alleges as follows:

25      153.    Ms. Harrison's Essure® device was defective at the time of its sale and
26  distribution, and at the time it left the possession of Defendants, in that the product did
27  not adequately warn of the risks involved in its use and in that the system differed from
28  Defendants' intended result and design specifications.

PARRY⊙PFAU

154.    The Essure® device contained a manufacturing defect when it left Defendants' possession, in that Defendants' manufacturing process did not conform to the CGMP design controls enumerated in 21 C.F.R. § 820.30. When the facilities where Essure® was being manufactured were actually inspected by the FDA for Product and Process Controls, ongoing and systematic failures related to the control of non-conforming materials was documented, in both 2003 at Conceptus in Mountain View, California and in 2011 at Defendants' contract manufacturer facility in Mexico in violation of 21 C.F.R. § 820.30(f).

155.    The defects inherent in the Essure® device were not readily recognizable to the ordinary consumer, including Ms. Harrison and/or Ms. Harrison's, physicians.

156.    At all relevant times, Defendants' Essure® was prescribed and used as intended by Defendants and in a manner reasonably foreseeable to Defendants.

157.    The Essure® manufactured, marketed, promoted, and sold by Defendant was expected to, and did, reach the consuming public, including Ms. Harrison, without substantial change to the condition in which it was sold.

158.    At all times relevant to this action, the dangerous propensities of Essure® were known to Defendants or were reasonably and scientifically knowable to them, through appropriate research and testing by known methods, at the time they distributed, supplied, or sold the device, and not known to ordinary physicians who would be expected to prescribe and implant Essure® for their patients.

159.    Ms. Harrison was implanted with the Essure® device in 2010. Defendants had been cited approximately just one year later by the FDA for failure to report complications it knew were associated with Essure®; had been cited by the FDA within the prior year for failure to perform an appropriate Risk Analysis Design Failure Mode Effects Analysis and to undertake Corrective and Preventative Action to address manufacturing defects; and had been cited by the FDA within the prior year for use of uncertified materials and non-conformity of the contract manufacturer for not following their own SOP for control of non-conforming material. These manufacturing violations

1  affecting the manufacturing quality of the Essure® were not isolated events but
2  represented ongoing, systematic, and widespread conduct by Defendants that signified
3  problems with the manufacturing process starting before Ms. Harrison received her
4  Essure® implant and continuing through at least August 2015.

5      160.    As a proximate result of the Essure®'s defective condition at the time it was
6  sold, Ms. Harrison suffered and will continue to suffer severe physical injuries, severe
7  emotional distress, mental anguish, economic loss, and other injuries for which she is
8  entitled to compensatory and other damages in an amount to be proven at trial.

9      161.    Wherefore, Ms. Harrison prays for judgment against Defendants as
10  hereinafter set forth.

11                              **Fourth Cause of Action**

12                                    **(Fraud)**

13      162.    Ms. Harrison repeats, realleges, and incorporates by reference the preceding
14  paragraphs as of fully set forth herein.

15      163.    California Civil Code § 1709 provides that one who willfully deceives another
16  with intent to induce her to alter her position due to her injury or risk, is liable for any
17  damages which she thereby suffers.

18      164.    California Civil Code § 1710 provides, in part, that a deceit, within the
19  meaning of section 1709, is the suggestion, as a fact, of that which is not true, by one
20  who has no reasonable ground for believing it to be true; or the suppression of fact, by
21  one who is bound to disclose it, or who gives information of other facts which are likely
22  to mislead for want of communication of that fact.

23      165.    As set forth above, the Defendants willfully deceived Ms. Harrison and her
24  healthcare providers, the medical community, and the public in general, by making
25  representations about their product that they knew to be false or had reasonable ground
26  for believing to be true, and by concealing material information concerning Essure®, and
27  thereby held a position of superiority over Ms. Harrison and her physicians.

28      166.    Through their unique knowledge and expertise regarding the defective

                                    – 40 –
                      _____

nature of Essure®, and through their marketing statements to physicians and patients in advertisements, promotional materials, labels and other communications as herein alleged, Defendants professed to physicians that they were in possession of facts demonstrating that Essure® was safe and effective for its intended use and was not defective, Defendants concealed material information that they had a duty to disclose to ensure such physicians were not mislead.

167.    Ms. Harrison and/or her healthcare providers reasonably relied on these false and misleading representations. Specifically, Ms. Harrison would have never had Essure® implanted has she been aware that there had been 32,000 complaints regarding Essure®, the vast majority of which were not timely reported to the FDA, the medical community, or the public. In addition, Ms. Harrison would have never had the Essure® implanted had she been aware of the falsity of the representations specifically delineated in the foregoing section, "Defendants Engaged in False and Misleading Sales and Marketing Tactics."

168.    Defendants took unconscionable advantage of their dominant position of knowledge with regard to Essure®. As a result of the foregoing fraudulent and deceitful conduct by Defendants, Ms. Harrison has suffered and continues to suffer severe physical injuries, severe emotional distress, mental anguish, economic losses and other damages for which she is entitled to compensatory and other damages in an amount to be proven at trial.

169.    Wherefore, Mr. Harrison prays for the judgement against Defendants as hereinafter set forth.

## Prayer for Relief

Wherefore, Ms. Harrison prays for judgment against Defendants and, as appropriate to each cause of action alleged and as appropriate to the standing of Ms. Harrison as follows:

1. Economic damages in an amount as provided by law and to be supported by

PARRY⊗PFAU

evidence at trial;

2.   Special damages in an amount as provided by law and to be supported by evidence at trial;

3.   Punitive or exemplary damages, to be determined by a trier of fact;

4.   Cost of Suit, and attorneys' fees as provided by law;

5.   Prejudgment interest as provided by law; and

6.   Such other and further relief as the Court may deem just and proper.

DATED this 21st day of November 2016.        PARRY & PFAU

Matthew G. Pfau, Esq.
California Bar No.: 256309
880 Seven Hills Drive, Suite 210
Henderson, Nevada 89052
702 879 9555 TEL
702 879 9556 FAX

Attorneys for Plaintiff,
*Denise Harrison*

– 42 –

FIRST AMENDED COMPLAINT